J-A13005-19

2019 PA Super 333

| | | |
|---|---|---|
| CITY OF ALLENTOWN, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LEHIGH COUNTY AUTHORITY | : | No. 3089 EDA 2018 |

Appeal from the Order Entered September 25, 2018
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2018-C-1765

BEFORE:   SHOGAN, J., NICHOLS, J., and STRASSBURGER*, J.

OPINION BY SHOGAN, J.:                       **FILED NOVEMBER 7, 2019**

Appellant, the City of Allentown ("the City"), appeals from the order entered in the Court of Common Pleas of Lehigh County on September 25, 2018, denying its motion for a preliminary injunction against Appellee, Lehigh County Authority ("LCA").  We affirm.

The trial court summarized the factual history of this case as follows:

On May 1, 2013, the parties entered into the Allentown Water and Sewer Utility System Concession and Lease Agreement [("the Agreement")[1]].  The Agreement contains specific obligations for ensuring that LCA maintains the water and sewer utility systems it was leasing for a fifty-year time period.  The Agreement also contains express provisions limiting the extent to which water and sewer bills sent to City residents can be increased by LCA.  Specifically, Article 7 of the Agreement generally governs

_____

[1] Relevant excerpts of the Agreement are included in the certified record.  The full agreement is available at: https://lehighcountyauthority.org/wp-content/uploads/Allentown-Water-and-Sewer-Concession.-Lease-Agreement-May-1-2013.pdf.

_____

*   Retired Senior Judge assigned to the Superior Court.

the imposition of Service Charges on City residents, and the amount by which those service charges can be increased on an annual basis.

Section 7.1(d) of the Agreement provides for the "Initial Schedule of Rates" and substantially restricted LCA from revising that Schedule without the prior approval of the City prior to January 2016. Accompanying [the Agreement] was a set of schedules. Schedule Three details the various service charges imposed as of 2016 for water and sewer service based upon the size of the piping serving a particular address. By and large, any customer with a pipe size from 5/8" to one inch is a residential ratepayer, while those addresses with wider pipe sizes are almost uniformly commercial customers.

In addition, the Schedule listed the service charges, or rates, to be imposed on residential and commercial customers based on billing cycles. Residential customers were billed on a quarterly basis, while commercial customers were billed on a monthly cycle. This was the billing cycle pattern used by the City when it operated the water and sewer systems. Respondent LCA continued this billing cycle practice when it took over the operation of the systems even though the express terms of [the Agreement] do not compel the continuation of the quarterly billing cycle for residential customers.

After the commencement of [the Agreement] in 2013, LCA determined that approximately 750 residential and commercial customers were being billed on the incorrect billing cycle, i.e., some residential customers were billed monthly and some commercial customers were billed quarterly. However, LCA notified the City it intended to correct, or "true up," this anomaly. The City understood this correction occurred by 2016.

Beginning in 2016, the Agreement permitted LCA to increase rates on City customers subject to specific limitations. In particular, Section 7.1(e) restricted LCA to increasing rates only once per calendar year. That subsection also provides that for each calendar year beginning in 2016, LCA may increase the Service[] Charges billed for each class or type of Utility Service, but any increase in service charges may not exceed the Permitted Annual Rate Adjustment.

The "Permitted Annual Rate Adjustment" is based on the "Schedule of Service Charges" in effect for the prior year multiplied by the combined sums of the "Index Change" for the calendar year, and a fixed rate multiplier referred to as the "Margin Change." The "Index Change" generally corresponds to any increase in the Consumer Price Index for Urban Consumers - Northeast Region as compiled by the U.S. Department of Labor, Bureau of Labor Statistics. According to the terms of [the Agreement], the "Margin Change" from 2016 - 2032 is 2.5% per year. That rate falls to 2.0% per year from 2033 until the expiration of the lease agreement.

As of November 13, 2017, LCA published its proposed rates for water and sewer service for both residential and commercial customers effective January 1, 2018. The rates were quoted in both monthly and quarterly billing rates for both types of consumers. Until 2016, LCA had not published a schedule of new rates listing both monthly and quarterly billed amounts for each class of customers. For both 2017 and 2018, the published rates indicated what the billed amounts would be for both residential and commercial customers on both a monthly and a quarterly billing cycle. Despite these two types of rates being included in the schedules published in 2017 and 2018 for implementation the following year, LCA continued the past practice of billing Small Meter Customers on a quarterly basis, and Large Meter Customers on a monthly rate schedule.

[The City] does not dispute that the 2017 rate schedule fell within the permitted renewal rate adjustment, using the 2016 rates as the base figure. As was testified to at the hearing on the motion for the preliminary injunction, the Index Change for 2016 was 0.8% for that year, meaning the annual rate adjustment for 2017 was only 3.3% (0.8% Index Change + 2.5% Margin Change). For calendar year 2018, the Index Change from 2017 was 1.5%. When added to the fixed multiplier of 2.5%, the permitted annual rate adjustment as published for 2018 was 4.0%.

However, on May 21, 2018, the LCA board unanimously approved a resolution to convert from a quarterly billing schedule to a monthly billing schedule for Small Meter Customers, effective August 1, 2018. Based on the resolution approved by the LCA Board, the amount paid annually by residential customers as of August 1, 2018 would jump from $150 up to $311, an increase of

107%. [The City] argues this level of rate adjustment is well beyond the permitted annual rate change under the terms of [the Agreement]. Additionally, [the City] asserts that such a midyear rate adjustment violates the terms of Article 7.1(e).

Trial Court Opinion, 9/25/18, at 2-5 (internal citations omitted).

The City filed a complaint on July 10, 2018, and a motion for preliminary injunction on July 16, 2018. LCA filed an answer to the complaint on August 2, 2018, and an answer to the motion for preliminary injunction on August 6, 2018. The trial court held an evidentiary hearing on the motion for preliminary injunction on September 4, 2018. On September 25, 2018, the trial court issued an order and opinion denying the motion for preliminary injunction. The City filed a notice of appeal on October 24, 2018. The City and the trial court complied with Pa.R.A.P. 1925.

The City presents the following issues for our review on appeal:

1. Whether the [t]rial [c]ourt committed reversible error in concluding that the City of Allentown, which was a party to the contract, did not have standing to bring the lawsuit against Lehigh County Authority ("LCA") for breach of contract.

2. Whether the [t]rial [c]ourt committed reversible error in concluding that implementation of monthly billing would not immediately and irreparably harm the City and its residents.

3. Whether the [t]rial [c]ourt committed reversible error in concluding that the City did not provide evidence that a greater injury would be suffered by the City if injunctive relief was denied.

4. Whether the [t]rial [c]ourt committed reversible error in concluding that the City has not demonstrated that granting injunctive relief would serve the public interest.

5.     Whether the [t]rial [c]ourt committed reversible error in concluding that any claim by the City would be premature until the rate increase goes into effect.

Appellant's Brief at 2-3.

The standard of review applied when reviewing a decision to grant or deny a preliminary injunction is as follows:

We recognize that on an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the trial court.

*Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000 (Pa. 2003).

"The purpose of a preliminary injunction is to preserve the status quo as it exists or previously existed before the acts complained of, thereby preventing irreparable injury or gross injustice." *Santoro v. Morse*, 781 A.2d 1220, 1229 (Pa. Super. 2001) (emphasis omitted). A petitioner seeking a preliminary injunction must establish every one of the following prerequisites:

First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief

- 5 -

is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits.  Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity.  Sixth, and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

*The York Group, Inc. v. Yorktowne Caskets, Inc.*, 924 A.2d 1234, 1241 (Pa. Super. 2007) (quoting *Summit Towne Centre*, 828 A.2d at 1001).

In its first issue, the City argues that the trial court erred in concluding that it lacked standing to bring the lawsuit against LCA for breach of contract. Appellant's Brief at 19.  The City asserts that "[i]t is black letter law that direct parties to a contract have a right to sue under the contract." *Id.*  The City maintains that the cases relied upon by the trial court are inapposite and distinguishes those cases from the factual scenario in this case. *Id.* at 21-24. Specifically, the City explains that in those cited cases, the parties bringing suit were not parties to the contract at issue, nor did they have a direct, substantial interest in the matter, and therefore had no standing to sue. *Id.* at 23-24.  In contrast, the City posits in the case *sub judice,* "[T]he City of Allentown is a party to and signatory to the Agreement in dispute, and it has been directly harmed by LCA's actions." *Id.* at 24.  Accordingly, it is the City's position that it has standing to sue LCA in this matter. *Id.* at 24.

In addressing the standing issue, the trial court provided the following analysis:

> [I]f the proposed rate increase were to go into effect as LCA has suggested, it would be the residential customers, not the City, who would suffer a harm from the alleged breach of the provision

to cap possible annual rate increases. In order to have standing to pursue a lawsuit, a party must show a substantial, direct and immediate interest in the subject of the litigation. The requirement of a "substantial interest" means there must be some discernible adverse effect to some interest of the party other than the abstract interest a municipality maintains on behalf of all its citizens. *See Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975). "[W]here it cannot in any sense be regarded as a representative of the public or its inhabitants or citizens, it has been held that such a (municipal) corporation may not maintain an action to protect the rights of its resident taxpayers where the litigation does not affect such a corporation directly." *City of Hazleton v. Hazleton Area School District*, 276 A.2d 545, 547 (Pa. 1971).

Our appellate courts have concluded that a municipality does not stand in the position of its residents or taxpayers when attempting to pursue litigation in which the municipality cannot allege a direct harm. *Borough of Valley-Hi Incorporation Case*, 381 A.2d 204 (Pa. Cmwlth. 1977); *Upper Moreland Twp. v. Pennsylvania Dept. of Transportation*, 409 A.2d 118 (Pa. Cmwlth. 1979). The Court found that Appellant was unable to demonstrate how the City, rather than the citizens, will suffer any direct harm from LCA's proposed change in its billing cycles.

Trial Court Opinion, 12/13/18, at 9-10.

Parties to a contract can move to enforce the contract when there is a breach by another party. **Liss & Marion, P.C. v. Recordex Acquisition Corp.**, 983 A.2d 652, 659-661 (Pa. 2009). "A cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." **Reformed Church of Ascension v. Theodore Hooven & Sons, Inc.**, 764 A.2d 1106, 1109 (Pa. Super. 2000). Furthermore, our Supreme Court has explained:

> Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

*Ferrer v. Trustees of University of Pennsylvania*, 825 A.2d 591, 610 (Pa. 2002) (citation omitted). Moreover, a party to the contract can seek a preliminary injunction in an effort to enjoin a breach of contract. *Allegheny Anesthesiology Associates, Inc. v. Allegheny General Hosp.,* 826 A.2d 886, 891-893 (Pa. Super. 2003); *see also Santoro*, 781 A.2d at 1228 ("Pennsylvania courts sitting in equity have jurisdiction to prevent the continuance of acts prejudicial to the interest of individual rights, including the authority to enjoin wrongful breaches of contract where money damages are an inadequate remedy.").

In the case *sub judice*, the Agreement provides, *inter alia*, as follows:

> This ALLENTOWN WATER AND SEWER UTILTIY SYSTEM CONCESSION AND LEASE AGREEMENT (this "Agreement") is made and entered into as of this 1st day of May, 2013 by and between the City of Allentown, a municipality and a city of the third class of the Commonwealth of Pennsylvania duly organized and existing under the Constitution and laws of said Commonwealth and the City of Allentown Home Rule Charter (the "City"), and Lehigh County Authority, a municipal authority duly organized and existing under the Constitution and laws of said Commonwealth (the "Concessionaire").

The Agreement, 5/1/13, at 1. Furthermore, the "RECITALS" of the Agreement, provide in relevant part:

WHEREAS, the City owns and operates the Allentown Sewer Utility System constituting the assets herein defined as the "Sewer Utility System;" and

WHEREAS, the City owns and operates the Allentown Water Utility System constituting the assets herein defined as the "Water Plant and Distribution System" and the "Retained Water Supply System"; and

WHEREAS, the Concessionaire desires to lease the Sewer Utility System and the Water Plant and Distribution System from the City and to obtain a grant from the City of the right to provide Utility Services (as defined herein) in connection therewith, all as hereinafter provided; and

WHEREAS, the City desires to lease the Sewer Utility System and the Water Plant and Distribution System (collectively defined as the "System") to the Concessionaire and grant the Concessionaire the right to provide Utility Services in connection therewith, all as hereinafter provided; and

* * *

WHEREAS, the City is authorized by the City of Allentown Home Rule Charter to enter into this Agreement providing for the lease of the System, and the grant to the Concessionaire the right to operate the System in order to provide Utility Services, subject to the terms hereof; and

* * *

WHEREAS, the City will retain and continue to own, maintain and operate the Retained Water Supply System and the City has agreed to provide Raw Water (as herein defined) to the Concessionaire from the Retained Water Supply System; and

The Agreement, 5/1/13, at 1.

As the above-referenced language of the Agreement makes clear, the City is a party to the Agreement. The Agreement states that the City owns the System and will continue to own the System, and that LCA is leasing the

System to provide utility services. As an explicit party to the Agreement, the City has the authority to enforce the provisions of the Agreement. ***Liss & Marion, P.C.***, 983 A.2d at 659-661. Furthermore, as a party to the Agreement, the City has the ability to seek a preliminary injunction in an effort to enforce the provisions of the Agreement. ***Santoro***, 781 A.2d at 1228.

Indeed, the Agreement itself addresses any legal action between the parties as related to the Agreement. Section 16.1(a)(i-x) of the Agreement identifies potential defaults by LCA. The Agreement, 5/1/13, at 110-112. Section 16.1(b)(i-ix) provides remedies for the City upon LCA's default and allows the City to seek specific performance, injunction, or other equitable remedies. ***Id.*** at 112-113. Moreover, Section 16.1(b)(x) provides that upon LCA's default, "the City may exercise any of its other rights and remedies provided for hereunder or at law or equity." ***Id.*** at 113.

Additionally, Article 19 of the Agreement provides for dispute resolution between the Parties,[2] including informal dispute resolution procedures, mediation, and arbitration. The Agreement, 5/1/13, at 131-136. Specifically, Section 19.1 provides: "**Scope.** Any dispute arising out of, relating to, or in connection with this Agreement, including any question as to whether such dispute is subject to arbitration, shall be resolved as set forth in this Article

_____

[2] The Agreement defines "Party" and "Parties" as follows: "'Party' means a party to this Agreement and 'Parties' means both of them." The Agreement, 5/1/13, 21.

<u>19</u>." ***Id.*** at 131.

> Furthermore, Section 20.12 provides, in relevant part:

> Except as expressly provided herein to the contrary (including with respect to such rights as are expressly granted to each Leasehold Mortgagee pursuant to this Agreement), no term or provision hereof shall be construed in any way to grant, convey or create any rights or interests to any Person not a party to this Agreement.

The Agreement, 5/1/13, at 138-139.

Accordingly, we are constrained to disagree with the trial court's conclusion that the City lacked standing to seek legal redress for breach of contract.[3] However, for reasons discussed below, we cannot agree that it is entitled to relief on its request for a preliminary injunction.

The City's remaining four claims on appeal relate to its argument that entry of a preliminary injunction to enjoin LCA's actions is appropriate. In arguing that the trial court erred in failing to issue the preliminary injunction, the City first argues that the trial court incorrectly concluded that implementation of the monthly billing scenario would not immediately and irreparably harm the City and its residents. Appellant's Brief at 2. More specifically, the City argues:

> The evidence admitted at the preliminary injunction hearing concretely established that, given the high poverty rate in the

---

[3] As asserted by the City, the cases relied upon by the trial court in support of its conclusion that the City does not have standing to bring legal action against LCA are distinguishable from the case *sub judice* because in those cited cases, the party seeking legal action was not a party to a disputed agreement.

City, (a) the proposed rate increase would create an economic hardship, causing some customers to have difficulty paying their water and sewer bills and (b) would further exacerbate the City's blight problems, and that neither of these issues could be remedied fully with monetary compensation.

*Id.* at 27.

In addressing this prerequisite, this Court has explained:

[A] plaintiff seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by money damages. In order to meet this burden, a plaintiff must present "concrete evidence" demonstrating "actual proof of irreparable harm." The plaintiff's claimed "irreparable harm" cannot be based solely on speculation and hypothesis. Moreover, for purposes of a preliminary injunction the claimed harm must be irreversible before it will be deemed irreparable.

***Greenmor, Inc. v. Burchick Const. Co., Inc.***, 908 A.2d 310, 314 (Pa.

Super. 2006) (internal citations omitted).

In its analysis addressing this prerequisite, the trial court provided the

following explanation:

Contrary to Appellant's assertion, the [c]ourt's holding with respect to this element for a preliminary injunction was premised upon the finding that Appellant failed to offer sufficient *proof* of the existence of immediate and irreparable harm that cannot adequately be compensated by damages.

Immediate and irreparable harm is injury for which damages can only be estimated by conjecture and not by an accurate pecuniary standard or cannot be adequately compensated by an award of monetary damages. *See Boehm v. University of Pennsylvania School of Veterinary Medicine*, 573 A.2d 575 (Pa. Super. 1990). []In order to meet this burden, a plaintiff must present ["]concrete evidence["] demonstrating ["]actual proof of irreparable harm.["] *Kessler v. [Broder]*, 851 A.2d 944, 951 (Pa. Super. 2004) (citation omitted).

- 12 -

Appellant failed to satisfy this element for a preliminary injunction to issue for two reasons. First, its failure to present *any* testimony or offer any exhibits showing that the rate increase would cause residents to move outside of the [C]ity militated against a finding of immediate and irreparable harm. To the contrary, any harm alleged by the City was speculative.

Additionally, the [c]ourt did not receive any evidence that implementation of the monthly billing would immediately and irreparably harm any of the customers who would be affected in a manner that could not be remedied by monetary damages. As stated above, the billing cycle conversion was put on hold until resolution of the litigation. Additionally, Liesel Gross, the chief executive officer of LCA, testified that LCA would coordinate with the City to provide a reimbursement program to those customers if a court or arbitration panel determined that the change in the quarterly-to-monthly billing cycle was improper. Gross also testified that refunds could be sent via mailed check or that credits could be applied towards customers' next bill if necessary.

Given that any harm suffered by the City and/or its residents is compensable by monetary damages, and that the City's contention on the impact of the rate changes is only speculative at this time, the [c]ourt properly found the City has failed to demonstrate that Appellant would suffer immediate irreparable harm if the preliminary injunction [was] not granted.

Trial Court Opinion, 12/13/18, at 13-14 (emphasis in original).

We agree with the trial court's determination. LCA has failed to present "concrete evidence" demonstrating "actual proof of irreparable harm." *Greenmor, Inc.*, 908 A.2d at 314. Furthermore, the claimed harm is not irreversible and can be compensated adequately by monetary damages. *Id.* Thus, the City has failed to meet the "irreparable and immediate harm" prerequisite to issuance of a preliminary injunction. Accordingly, there were "apparently reasonable grounds" for the trial court's decision, and as such, we are compelled to affirm its decision. *Summit Towne Centre, Inc.*, 828 A.2d

at 1001. Furthermore, because the City has failed to establish one of the prerequisites, this Court need not address the others.[4] *Id.*

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/7/19

---

[4] Because Appellant's remaining issues relate to the other prerequisites necessary for issuance of a preliminary injunction and we have concluded that there were "apparently reasonable grounds" for the trial court's determination that one of those prerequisites was not met, we need not address the remaining prerequisites, *Summit Towne Centre, Inc.*, 828 A.2d at 1001, nor the City's remaining issues raising those prerequisites.