J-A08032-23

2023 PA Super 77

| | | |
|---|---|---|
| FRAPORT PITTSBURGH, INC.; FORMERLY KNOWN AS AIRMALL PITTSBURGH, INC. | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : : : | |
| v. | : : | |
| | : : | No. 974 WDA 2022 |
| ALLEGHENY COUNTY AIRPORT AUTHORITY | : : : | |

Appeal from the Order Entered August 17, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-22-007444

BEFORE:  STABILE, J., SULLIVAN, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                    **FILED: MAY 9, 2023**

Fraport Pittsburgh Inc., f/n/a Airmall Pittsburgh, Inc. (Fraport)[1] appeals the order entered in the Court of Common Pleas of Allegheny County (trial court) denying its motion for a preliminary injunction to enjoin the Allegheny County Airport Authority (ACAA) from evicting it from leased premises and otherwise interfering with its contractual rights under a Master Lease

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Fraport is a wholly-owned subsidiary of Fraport USA, which has contracts and leases at various airports in the United States.  Fraport USA's corporate parent is Fraport AG, a German company.  (**See** N.T. Hearing, 7/01/22, at 30, 32).

Agreement between the parties set to expire in December 2029 (Master Lease).[2]  On appeal, Fraport challenges the trial court's determination that it failed to meet the standards necessary to obtain a preliminary injunction because it could not show irreparable harm.  We reverse and remand for further proceedings.[3]

**I.**

The trial court aptly set forth the relevant facts and procedural history of this case as follows:

> This case arises out of a lease agreement between the Defendant, Allegheny County Airport Authority ('ACAA'), and Plaintiff, Fraport Pittsburgh Inc. ('Fraport') at the Pittsburgh International Airport ('the Airport').  The ACAA is a municipal authority of Allegheny County, which owns and operates the

---

[2] The complaint includes counts for Breach of Contract (Counts I-III), Breach of Duty of Good Faith and Fair Dealing, Conversion, Intentional Interference with Existing and Prospective Economic Advantages, and Declaratory Judgment.

[3] This interlocutory order denying injunctive relief is immediately appealable as of right pursuant to Pa.R.A.P. 311(a)(4).  Although ACAA maintains that transfer of this case to the Commonwealth Court is warranted because it is a "Commonwealth entity," and the underlying substantive issues in this case lend themselves to the Commonwealth Court's expertise, we disagree. (*See* ACAA's Brief, at 3; citing 42 Pa.C.S. § 762(a)(1), (4)).  While Section 762 of the Judicial Code provides for the Commonwealth Court's exclusive appellate jurisdiction over civil cases "by the Commonwealth government," municipal and other local authorities such as ACAA are specifically excluded from the definition of "Commonwealth government." *See* 42 Pa.C.S. § 102 (prescribing Definitions for purposes of Judicial Code).  Regarding ACAA's claim that the underlying substantive issues in this case lend themselves to the Commonwealth's expertise, we find that transfer is unnecessary given that the parties' dispute centers on breach of their commercial lease agreement, the examination of which is within our purview.

Airport. Fraport is a business engaged in the operations and management of retail and concessions at the Airport. Fraport Pittsburgh is a subsidiary of Fraport USA and, as a business entity, exists solely for the performance of its obligations under its lease agreement with the ACAA. No other entity leases the Airport's commercial space from the ACAA, and Fraport serves no other airport.

The Fourth Amended and Restated Master Lease, Development and Concession Agreement (the 'Lease' or 'Master Lease'), which grants an exclusive lease in the Airport's commercial space to Fraport, was originally signed in 1991 between the ACAA and Fraport's predecessor. The current lease term, which was renewed on December 27, 2012, runs until December 31, 2029. The Lease places Fraport in the role of the Airport's Master Concessionaire and Lessee, in charge of subletting the Airport's commercial spaces to restaurants, retail businesses, and other concessions. Among Fraport's duties as Master Concessionaire are identifying and entering into subleases with commercial subtenants, managing logistics of the commercial spaces, collecting rent, and ensuring subtenant compliance with safety guidelines and regulations. The Lease requires Fraport to inspect subtenants 'daily' for compliance issues and to ensure that the subtenant is properly stocked, staffed, and operating. Although the Lease does not expressly impose a security duty upon Fraport, responsibility generally for the safety and security of the Airport is shared broadly among Fraport, the Transportation Security Administration ('TSA'), the ACAA, the Allegheny County Police, and other Airport personnel. The Lease also requires Fraport to pay rent to the ACAA each month, based upon rent revenue received from subtenants during that month in the prior year, but this amount may be adjusted upon agreement of the parties. Fraport also retains a portion of the rent collected as part of its revenue.

Section 12 of the Lease provides for the procedures whereby the ACAA may terminate the Lease before expiration of the term. The ACAA can terminate the Lease if it notifies Fraport in writing of an Event of Default, which Event goes uncured for five days. An Event of Default is itself established upon the ACAA's written notification to Fraport of a breach of the Lease agreement. If a breach is left uncured for more than thirty days it becomes an Event of Default. The current dispute between the parties concerns whether and to what extent Fraport may have breached

its duties under the Lease, whether Fraport successfully cured any alleged breach, and whether the ACAA followed the proper procedures in notifying Fraport of alleged breaches and ripening those alleged breaches into Events of Default before terminating the Lease.

In the summer of 2021, the ACAA approached Michael Mullaney, the newly-appointed CEO of Fraport's parent, Fraport USA, to discuss the possibility of prematurely terminating the Lease pursuant to a mutually agreeable arrangement. Namely, the ACAA offered to buy Fraport out of the remainder of the lease term for $5 million. Although Mr. Mullaney rejected the offer, he indicated Fraport USA's willingness to negotiate a higher price. The ACAA, on the other hand, indicated it was not willing to negotiate further. Prior to these events, the relationship between the ACAA and Fraport was, to all appearances, cordial and successful. Nevertheless, after Fraport's refusal, the ACAA began to find issues in the parties' arrangement.

From September of 2021 through June of 2022, the ACAA attempted to identify, in writing, several Events of Default of the Lease agreement by Fraport. Among the Events of alleged Default were Fraport's failure to conduct 'daily' inspections, the insufficiency of those inspections, the unilateral reduction in rent paid by Fraport during the height of the COVID-19 pandemic, the relaxation of certain safety regulations regarding access badges, and the failure to report and/or cure security risks of varying types in subtenant locations. Despite Fraport's attempts to cure those alleged Events of Default, the ACAA continued to find new ones. This back-and-forth ultimately culminated in the ACAA summarily, and without prior notice, terminating the Lease and removing Fraport from the Airport premises on the morning of June 15, 2022. In addition to escorting Fraport's employees off the premises with police officers, the ACAA took possession of personal property and confidential files that remained in Fraport's offices.

Because the merits of the underlying dispute are not at issue in this appeal, this Court need not discuss these events at length. Suffice it to say that the ACAA's grounds for terminating the Lease are dubious, given its desire to prematurely buy Fraport out of the Lease, and the procedure by which it terminated the Lease seems,

- 4 -

at first blush, to contravene the procedures for notice and cure in Section 12 of the Lease.[4]

Fraport promptly filed motions for special and preliminary injunctions. On June 16, this Court granted the special injunction pending resolution of the motion for preliminary injunction.[5] The special injunction returned Fraport and its employees to the premises to conduct their business as usual. The personal property and files were also returned to Fraport's possession. However, it remained clear that the injunction was untenable long term, as Fraport's employees were escorted nearly everywhere and under constant supervision by ACAA personnel, hampering the performance of their jobs and keeping tensions raised.

(Trial Court Opinion, 10/03/22, at 1-4).

Despite the findings by the trial court that ACAA's grounds for termination were "dubious," its conduct was tantamount to harassment and

---

[4] Section 12 of the Lease provides in relevant part as follows under Article XII, "Termination of Lease by the [ACAA:]"

Section 12.02 Remedies of [ACAA] on Default. Notwithstanding any other provision in this Agreement, the Lessee [Fraport] agrees that after notice of the occurrence of any Event of Default and expiration of a five (5) day period in which to cure such Event of Default, [ACAA] may: (A) Terminate this Agreement without discharging any of [Fraport's] obligations hereunder and exclude [Fraport] from the premises[.]"

(Lease, at 45-46 Section 12.02(A)).

[5] The order granting a special injunction provided in relevant part: "(1) [ACAA] is hereby enjoined from terminating the [Lease] and any further contract or interference with [Fraport's] subtenants; (2) [ACAA] shall restore access to the landslide terminal at the Pittsburgh International Airport for any employees, subtenants, agents, or contractors of [Fraport] and immediately return all of [Fraport's] property that was seized." (Order, 6/16/22).

its reasons for termination were essentially manufactured. The trial court, after an evidentiary hearing, denied the preliminary injunction. While finding that Fraport may successfully meet five of the six elements necessary for the granting of a preliminary injunction, it found that Fraport failed to demonstrate that issuance of a preliminary injunction is necessary to prevent irreparable harm because any breach of the Master Lease is adequately compensable with monetary damages.[6] (*See* Trial Ct. Op., 8/17/22, at 3-4). It did so because, despite the conveyance of a leasehold interest to Fraport, the trial court characterized the Master Lease as predominately a services contract. (*See id.* at 15).

> To be sure, this Court does not presume that the Master Lease is not a lease in any sense. The Master Lease clearly grants a leasehold interest in the Airport's commercial property to Fraport, and it contains other characteristics of a lease, such as a covenant of quiet enjoyment. However, there are other, more predominant characteristics to the contract that can only be characterized as the performance of personal services. These include managing the Airport's commercial space, collecting rent, finding and entering into subleases with businesses, performing inspections, and other related tasks. These obligations are inextricably linked with the grant of the leasehold interest. Fraport's possession of the lease means nothing without the

---

[6] "To obtain a preliminary injunction, a petitioner must establish that: (1) relief is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages; (2) greater injury will occur from refusing to grant the injunction than from granting it; (3) the injunction will restore the parties to their status quo as it existed before the alleged wrongful conduct; (4) the petitioner is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and (6) the public interest will not be harmed if the injunction is granted." ***Shepherd v. Pittsburgh Glass Works***, ***LLC***, 25 A.3d 1233, 1241 (Pa. Super. 2011).

concurrent performance of these services for the benefit of the ACAA. This Court could not enforce the quiet enjoyment of Fraport's leasehold without also mandating that the ACAA accept Fraport's performance under the lease. The alternative would mean that Fraport employees could enter their office space, sit at their desks, and idly walk through the Airport's commercial space free from interference, but without performing any of their functions for the ACAA. This would be a fruitless exercise, and even office space is easily replaceable and compensable with expectation damages. Thus, the personal service nature of the Lease overshadows the leasehold interest. In such cases, courts have found damages to be an adequate remedy.

(*Id.* at 8-9).

Fraport timely appealed, and it and the trial court complied with Rule 1925. **See** Pa.R.A.P. 1925(a)-(b).[7]

## II.

On appeal, Fraport contends that the trial court, in denying the preliminary injunction, committed legal error for, among other reasons, finding that the Master Lease was a service contract and not a lease, and that

---

[7] Our review of a ruling on a preliminary injunction:

is limited to determining whether there were any apparently reasonable grounds for the action of the trial court. We will interfere with the trial court's decisions regarding a preliminary injunction only if there exists no grounds in the record to support the decree, or the rule of law relied upon was palpably erroneous or misapplied. It must be stressed that our review of a decision regarding a preliminary injunction does not reach the merits of the controversy.

*Anchel v. Shea*, 762 A.2d 346, 351 (Pa. Super. 2000), *appeal denied*, 782 A.2d 541 (Pa. 2001) (citation omitted).

its forcible eviction can be adequately compensated by money damages because a "lease" is not a unique interest in land.

We begin with the observation that leases are in the nature of contracts and are, thus, controlled by principles of contract law, including the well settled rules of interpretation and construction. *See Cusamano v. Anthony M. DiLucia, Inc.,* 421 A.2d 1120, 1122–23 (Pa. Super. 1980). As in the case of other written contracts, the purpose in interpreting a lease is to ascertain the intention of the parties, and such intention is to be gleaned from the language of the lease. *See Philadelphia Hous. Auth. v. Barbour*, 592 A.2d 47, 49–50 (Pa. Super. 1991), *aff'd*, 615 A.2d 339 (Pa. 1992). Such intention is not to be determined merely by reference to a single word or phrase, but rather by giving every part of the document its fair and legitimate meaning. *See Boyd v. Shell Oil Co.*, 311 A.2d 616, 618 (Pa. 1973); *Marcinak v. S.E. Greene School District*, 544 A.2d 1025, 1027 (1988).

Although the trial court characterized the Master Lease as predominately a services contract, the language of the agreement could not be more clear that the agreement between Fraport and ACAA is what it says it is — a lease. "A lease is defined as '[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in question for exchange of consideration, usu. rent.' Black's Law Dictionary 907 (8th ed. 2004). . . . A lease may be found where it is 'the intention of one party voluntarily to dispossess himself of the premises, for a consideration, and of

the other to assume the possession for a prescribed period.' ***Morrisville Shopping Center, Inc. v. Sun Ray Drug Co.***, [] 112 A.2d 183, 186 (Pa. 1955)." ***Forest Glen Condominium Association v. Forest Green Common Limited Partnership***, 900 A.2d 859, 865 (Pa. Super. 2006).

The present agreement is an extension of the original "Master Lease, Development and Concession Agreement" entered by Allegheny County and Fraport, then named BAA Pittsburgh, Inc. in 1991. Allegheny County subsequently assigned to ACAA all the County's right, title and interest under the Master Lease. This current extension runs through December 31, 2029. (***See*** Master Lease at 9, § 2.02). From the very inception in 1991, the parties expressed their unambiguous intention that what was being entered into was a lease stating, "the County granted Lessee a leasehold interest and other rights in portions of the Midfield Terminal Complex used for food and beverage, retail and service facilities[.]" (***See id.*** at 1, ¶ B). These are two sophisticated parties and if their primary intention was to craft a services agreement, they would have labeled the document a "Master Service Agreement" and not a Master Lease.

Moreover, there is nothing in the Master Lease to even give a whiff that the ACCA and Fraport intended to do anything other than enter a lease. To the contrary, they expressly stated in Section 14.06 of the Master Lease which sets forth the "**Relationship of the Parties**" that "Nothing contained in this Agreement is intended to create or establish any relationship **other than that**

**of lessor and lessee**[.]" (*Id.* at 51, § 14.06) (emphasis added). Moreover, the provisions of the Master Lease show that it is just that — a lease — which is made clear throughout the agreement. For example:

- "The Authority does hereby lease and demise to the Lessee, and the Lessee does hereby rent from the Authority, the premises" (Master Lease, at 8 § 2.01(A)).

- Fraport is obligated to pay "Rent" for its leasehold interests. (*See id.* at 17, §§ 4.01-4.02).

- Fraport is granted "Quiet Enjoyment of Premises" (*Id.* at 11, § 2.08).

- Article VI sets forth the terms and conditions under which Fraport is permitted to enter "Leasehold Mortgages" (*Id.* at 22-28).

- Section 8 requires Fraport to "design, construct, lease and manage the Retail Premises in accordance" with the Master Lease. (*Id.* at 29, § 8.01).

- The ACAA is not a party to any subleases and only has limited authority to approve proposed subleases between Fraport and potential subtenants. (*See id.* at 30, § 8.02(C)). The Master Lease expressly provides that the ACAA's "approval rights with respect to subleases . . . shall not permit the [ACAA] to participate in the negotiation of the terms of any sublease" and such negotiations are "to be on a commercial basis between [Fraport] and the Subtenant." (*Id.* at § 8.02(E)).

- Fraport was required to undertake capital improvements to the premises and, if the Master Lease terminated early, such improvements were deemed part of the leased property and became property of the ACAA as the lessor. (*See id.* at 12, § 3.01, 15 § 3.07, 16 § 3.08(B).

To the extent we understand the trial court's reasoning, it seems to arrive at the conclusion that the Master Lease was a services contract because Fraport, in managing the Airport's commercial space, its leasehold, collected

rent from its subtenant, found and entered subleases with businesses, and performed inspections and other related tasks, making it predominately a contract for services. It then goes on to state that because Fraport's possession of the lease means nothing without the concurrent performance of those services for the benefit of ACAA, it finds the necessary implication that to enforce quiet enjoyment of Fraport's leasehold would mandate that ACAA accept Fraport's performance under the lease.

Ignoring that the parties have defined their relationship as lessor and lessee, the characteristics the trial court incorrectly identifies as services are tied to Fraport's utilizing its authority under its leasehold interest that allows it to sublease space to tenants, collect the rent and so on, and not to provide services to the ACCA but to act as the landlord to the subtenants. Furthermore, if ACCA is dissatisfied with Fraport's compliance with its obligations under the Master Lease, it can avail itself of Section 12.02 of the Master Lease to seek the "Remedies of the Authority on Default" as the parties agreed.[8]

---

[8] Article 12 of the Master Lease sets forth the reasons for which procedures by which ACAA can seek to terminate the Master Lease. Section 12.01 defines the elements of an "Event of Default." Only if an Event of Default has been established under Section 12.01 of the Master Lease may ACAA seek the "Remedies of the Authority on Default" provided in Section 12.02. (**See** Master Lease, at 44-45).

Before an issue can become an Event of Default under Section 12.01(A), ACAA must provide a notice alleging that Fraport has failed to pay "Rent" under the

- 11 -

Now that we have determined that the trial court made an error of law in characterizing the Master Lease as a services contract, we must determine whether a preliminary injunction should have been issued.

## III.

## A.

The trial court found that evidence demonstrating all the elements of a preliminary injunction was shown except for the first element requiring "immediate and irreparable harm [defined as] injury for which damages can only be estimated by conjecture and not by an accurate pecuniary standard

_____

Master Lease and demand that it be paid within five days of the notice or ACAA will terminate the Master Lease. (**See id.** at 44). Similarly, before a non-Rent issue can become an Event of Default under Section 12.01(J): 1) ACAA must provide a written notice of Fraport's failure to keep, perform, and observe a material promise, covenant, or other provision of the Master Lease; 2) the notice must request that the issue be remedied and state the Authority's intention to terminate the Lessee's rights if the failure is not remedied and; 3) Fraport must fail to resolve the issue within thirty days after receiving the notice, subject to the caveat that "any such failure which can be remedied, but which cannot with due diligence be remedied within such thirty-day period, shall not give rise to the Authority's right to terminate this Agreement if corrective action is instituted by the Lessee within the applicable period and diligently pursued until the failure is remedied." (**Id.** at 45, § 12.01(J)).

Prior to its right to seek any of the remedies found in Section 12.02 of the Master Lease, ACAA must: 1) provide Fraport with notice of the occurrence of the alleged Event of Default; and 2) afford Fraport a five-day period in which to cure any such identified Event of Default. (**See id.** at 45-46, §12.02). Absent compliance with Sections 12.01 and 12.02 of the Master Lease, the Authority's remedies for collection of Rents or other breach of the Master Lease by Fraport are limited to those "available . . . at law or in equity." (**Id.** at 46, § 12.04).

or cannot be adequately compensated by an award of monetary damages." *City of Allentown v. Lehigh Cnty. Auth.*, 222 A.3d 1152, 1160 (Pa. Super. 2019) (citation omitted). "In order to meet this burden, a plaintiff must present concrete evidence demonstrating actual proof of irreparable harm." *Id.* (citation omitted).

Where there is a real property interest, the loss of that interest constitutes irreparable harm because each parcel of real estate is unique. *See Peters v. Davis*, 231 A.2d 748 (Pa. 1967), stating:

> The aggrieved property owner's right is absolute. However hard his acts might be regarded; he asks the court for the enforcement of a legal right of a positive character with respect to land which it is conceded was wrongfully taken from him. He is entitled to a decree. The rule in such a case is founded on sound reason. If damages may be substituted for the land, it will amount to an open invitation to those so inclined to follow a similar course and thus secure valuable property rights. The amount of land involved does not change the situation. Here is a wrongful invasion of a positive right to real property. If a property owner deliberately and intentionally violates a valid express restriction running with the land or intentionally 'takes a chance', the appropriate remedy is a mandatory injunction to eradicate the violation.

*Id.* at 752 (citation omitted).

Our Supreme Court has also held that, "In light of the unique and intrinsic value of land, interference with the plaintiff's contractual rights to ownership of that land must be deemed irreparable harm." *New Eastwick Corp. v. Philadelphia Builders Eastwick Corp.*, 241 A.2d 766, 770 (Pa. 1968). Additionally, regarding possession of a leasehold interest, "[t]here is substantial common-law authority that the leasing of property is identical to

- 13 -

the sale of the premises." ***Com.***, ***by Creamer v. Monumental Properties***, ***Inc.***, 329 A.2d 812, 822 (Pa. 1974) (citation omitted).

In this case, ACAA approached Fraport with an offer to buy out its leasehold interest and Fraport declined to accept it. Like the defendant in ***Peters***, ACAA interfered with Fraport's property rights and effectively forced the result it wanted. Based on the foregoing, we conclude that the harm to Fraport is irreparable because a real property interest is unique, and the extent of the injury to its property interest is inherently unascertainable making the harm that it suffers incapable of being fully compensated by money damages.

### B.

Not only should a preliminary injunction be issued because money damages cannot compensate Fraport for loss of its leasehold interest, but it was also an error for the trial court not to issue a preliminary injunction due to ACAA's self-help by the improper use of the Allegheny County Police to advance its commercial interests to evict Fraport.

Because a landlord/tenant relationship existed, ACAA was required to utilize the procedures set forth in the Landlord Tenant Act of 1951[9] to lawfully

---

[9] 68 P.S. §§ 250.101 to 399.18.

evict[10] Fraport. The Landlord Tenant Act is a comprehensive regulatory scheme governing the landlord and tenant relationship. *See Stonehedge Square Ltd. P'ship v. Movie Merchants, Inc.,* 715 A.2d 1082, 1085 (Pa. 1998). It "sets up the procedure whereby a landlord may repossess [the] premises if he has a right to evict the tenant." *Warren v. City of Philadelphia*, 115 A.2d 218, 221 (Pa. 1955). The Landlord Tenant Act states that all other inconsistent acts are repealed and that "**[i]t is intended that this act shall furnish a complete and exclusive system in itself**." 68 P.S. § 250.602 (emphasis added).

After it complied with the default provisions contained in the Master Lease to trigger a default, to comply with the Landlord Tenant Act, ACAA was required to give a notice to quit. *See* 68 P.S. § 250.501(a). If the eviction is not for failure to pay rent but for a breach of any other condition of the lease and the lease is for more than one year, the notice to quit must give a commercial tenant 30 days to leave voluntarily. *See* 68 P.S. § 250.501(b).

---

[10] "An eviction is an act by a landlord or a third person that interferes with a tenant's possessory right to the demised premises." *See Oakford v. Nixon*, 35 A. 588, 589 (Pa. 1896); *see also* 49 Am. Jur.2d Landlord and Tenant § 300 (1970). If that act is wrongful, the tenant may sue for damages in trespass or assumpsit. *See Kelly v. Miller*, 94 A. 1055, 1056–57 (Pa. 1915). "[T]here is an implied covenant for the quiet enjoyment of the demised premises, and it is settled in this State that any wrongful act of the landlord which results in an interference of the tenant's possession, in whole or in part, is an eviction for which the landlord is liable in damages to the tenant." *Kuriger v. Cramer*, 498 A.2d 1331, 1338 (Pa. Super. 1985); *see also Minnich v. Kauffman*, 108 A. 597, 598 (Pa. 1919); *Schienle v. Eckels*, 76 A. 15, 16 (Pa. 1910).

If the tenant does not voluntarily quit the premises within the time period listed in the notice to quit, the landlord still cannot evict the tenant itself. Instead, the landlord must file a legal action in court to obtain an eviction. *See* 68 P.S. § 250.502. Once a writ of possession has been issued, a constable or sheriff will enforce the writ of possession to evict the tenant. *See* 68 P.S. § 250.504.

Without complying with the Landlord Tenant Act or the Master Lease provisions dealing with default, ACAA engaged in self-help to evict Fraport from the premises. On June 15, 2022, ACAA's Director of Security accompanied by two armed Allegheny County Police Officers intercepted Fraport's personnel before they could enter Fraport's offices and instructed them to gather their personal belongings and depart the Airport under guard. (*See* N.T. Hearing, 7/01/22, at 108; N.T. Hearing, 7/13/22 at 59-63). At the same time that Fraport's personnel was escorted off the premises, ACAA emailed the subtenants — with whom ACAA had no contractual relationship — and informed them that ACAA was now "managing" the concessionaire program and that all aspects of the program, including financial matters related to rent, would now be handled by ACAA. (*See* Joint Exhibit 20, 6/15/22 email memorandum to "Valued ACAA Concessions Partners" from Bryan Dietz, SVP of Commercial Development at ACAA).

Regarding self-help, while the Landlord Tenant Act provides that it is the "**complete and exclusive system in itself**" **to obtain the eviction of**

**tenants**, surprisingly, no Pennsylvania appellate decision has addressed the issue of the appropriateness of a landlord's use of self-help, but the courts of common pleas which have addressed this issue have consistently held self-help is not available to evict a tenant. *See e.g.*, *O'Brien v. Jacob Engle Foundation, Inc.*, 47 Pa. D. & C.3d 557, 558–59 (Cumberland Cty. 1987) (noting that self-help should not be used where judicial procedures, like the Landlord Tenant Act, are available); *Lenair v. Campbell*, 31 Pa. D. & C.3d 237, 241 (Philadelphia Cty. 1984) ("Upon reviewing the [Landlord Tenant Act] in its entirety, it becomes apparent that self-help eviction is not a remedy under any circumstances. . . . [T]he legislature clearly expressed its intention that the Act be the sole source of rights, remedies and procedures governing the landlord/tenant relationship."); *Wofford v. Vavreck*, 22 Pa. D. & C. 3d 444, 453 (Crawford Cty. 1981) ("A landlord desirous of seeking repossession of his leased premises from his tenant for nonpayment of rent must do so either by bringing an action under the Landlord and Tenant Act [], and the related Pennsylvania Rules of Civil Procedure for Justices of the Peace, or by bringing an action in ejectment."); *Williams v. Guzzardi*, 875 F.2d 46, 52 n. 13 (3d Cir. 1989) (analyzing pertinent Pennsylvania law). Moreover, under the Master Lease, the ACCA limited itself to seeking only remedies at law and equity and not to engage in self-help, even if it was permissible. *See* Master Lease at 46, § 12.04).

In this case, ACAA employed self-help by using Allegheny County Police,

who are at the Airport to protect the public safety, to advance instead its commercial interests to forcibly remove Fraport personnel from the property. By doing so, the ACCA's actions were contrary to both the Landlord Tenant Act as well as the terms of the Master Lease limiting its remedies to only those available in law and equity, and constituted irreparable injury as a matter of law. ACAA's conduct was a seizure of Fraport's real and personal property, including the leases it had with its subtenants. "It cannot be gainsaid that appellants had a right to insist that the police not seize their property without due process of law. . . . Thus, the interest to be protected here, which can never be compensated for in damages, extends beyond the instant appellants to the community at large." *Berman v. City of Philadelphia*, 228 A.2d 189, 191 (Pa. 1967). Our Supreme Court went on to state, "the failure of the court below to insist that the police resort to the available legal machinery rather than forcibly evicting appellants [by denying the motion for preliminary injunction], thereby ensuring the dignity of the legal process, did amount to an abuse of discretion." *Id.*

Accordingly, for the foregoing reasons, the order of the trial court denying Fraport's request for a preliminary injunction is reversed and the case is remanded for it to enter a preliminary injunction restoring Fraport's rights in accordance with the Master Lease.

Order reversed. Case remanded for further proceedings consistent with this Opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/9/2023</u>