J-S26002-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MARK SHILLINGTON, L.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PRICE CHOPPER OPERATING | : | No. 1486 MDA 2024 |
| COMPANY OF PENNSYLVANIA INC. | : | |

Appeal from the Order Entered September 23, 2024
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
8246-C of 2002

BEFORE: LAZARUS, P.J., OLSON, J., and BECK, J.

MEMORANDUM BY LAZARUS, P.J.:          **FILED: SEPTEMBER 4, 2025**

Mark Shillington, L.P., (Shillington) appeals from the order, entered in the Court of Common Pleas of Luzerne County, granting the motion for summary judgment filed by Appellee, Price Chopper Operating Company of Pennsylvania (Price Chopper) and denying Shillington's cross-motion for summary judgment in this breach of lease case. We affirm.

Kingston Plaza[1] was a one-story commercial shopping center located on Third Avenue in Kingston, Luzerne County. The shopping center included, among other things, various restaurants and retail clothing stores.[2] On

---

[1] Light Acadia 11-89, LLC (Light Acadia) is the fee simple owner of Kingston Plaza. Light Acadia is not a party to this action.

[2] Kingston Plaza no longer exists; it is now the site of the Sidney and Pauline Friedman Jewish Community Center.

January 15, 1980, Village Supermarket, Inc. (Village)[3] entered into an agreement (Agreement) with Kingston Plaza, Inc., one of the original landlords of the shopping center. The Agreement provided that Village (operating as a ShopRite supermarket) would be the anchor tenant of the shopping center and lease a 45,000 square-foot space (Premises) of Kingston Plaza. **See** Indenture of Lease, 1/15/80, at 1. Village paid a fixed annual rent of $235,000.00. Pursuant to the Agreement, the lease term "shall commence on the date hereof and shall continue to and include the date which is twenty-five (25) years after the Rent Commencement Date (as hereinafter defined)[4] if the Rent Commencement Date is the first day of a month, or twenty-five (25) years after the last day of the month in which the Rent Commencement

---

[3] Village is a grocery store company that operates a chain of 25 supermarkets in New Jersey and Pennsylvania under the franchised name, ShopRite. **See** https://www.company-histories.com/Village-Super-Market-Inc-Company-History.html (last visited 7/30/25).

[4] The term "Rent Commencement Date" (RCD) is defined, in the Agreement, as follows:

> The [RCD], as used herein, shall be the earlier to occur of the following dates: (i) the date of Delivery of Possession, as hereinbefore defined (subject to extension if and for such period as Tenant is not required to accept such Delivery of Possession under the terms of paragraph 5D; or (ii) the date of the opening by Tenant of its store on the Demised Premises for business with the public.

**Id.** at 15. The parties do not dispute that the RCD, as defined in the Agreement, was December 2, 1981, and that the lease term expired on December 2, 2006. **See** Appellant's Brief, at 7; Appellee's Brief, at 5.

Date occurs if the Rent Commencement Date is not the first day of a month[.]"

*Id.* at 2.

Any assignment or subletting under the Agreement was controlled by the following provisions:

A. Subject only to limitations hereinafter set forth in this paragraph[], **the [] Premises may be used by the Tenant as a supermarket** selling those items found in supermarkets of its type in metropolitan New York or Pennsylvania.

(1) No use or operation of the [] Premises by any permitted assignee or subtenant that is different from a supermarket use shall violate or be in conflict with a then[-]outstanding leasing commitment made by Landlord to a tenant of any other space in the Shopping Center restricting the uses permitted therein who is then in, or thereafter takes, occupancy of such space in accordance with such commitment, provided, however, that Landlord shall, within fifteen (15) days after request from Tenant, furnish to Tenant a list of any such commitments or restrictions then outstanding, identifying the tenants benefitting therefrom.

(2) Tenant will not permit any act to be done or any condition to exist on the [] Premises or any part thereof or any article to be brought thereon which is or may be deemed to be dangerous unless the same shall be safeguarded as required by law, or which may, in law, constitute a public or private nuisance, or which may make void or voidable any insurance required by this Lease to be carried by Tenant with respect to the [] Premises, unless Tenant can replace such insurance.

B. Subject to the conditions hereinafter set forth in this paragraph[], and to the suspension and/or termination of operation occasions by reason of condemnation or casualty to the Tenant Improvements or other portions of the Shopping Center as set forth elsewhere in this Lease, **the [] Premises shall be kept open to the public for the conduct of business as a food supermarket (i) under the "Shop[]Rite" trade name, in accordance with the policies established for the operation of all similar stores under that trade name for a continuous**

**period of ten (10) years next following the [RCD] (the "Continuous Operations Period"). Tenant agrees that during the Continuous Operations Period, Tenant will not assign, mortgage, pledge, sublet[,] or encumber the Lease, the whole or any part of the [] Premises or permit any other person to occupy the whole or any part of the [] Premises.**

*Id.* at 16 (emphasis added).[5] Finally, the Agreement contained the following restrictive covenant:

A. During the term of this Lease, **unless Tenant has theretofore discontinued conducting business at the Demised Premises or has ceased to operate the Demised Premises as a food supermarket**, Landlord agrees not to use, let or sublet or to permit the use, letting or subletting of any other store, in the Shopping Center, (i) for any noxious or offensive uses; (ii) for manufacturing or for use as a bowling alley, funeral parlor, card club, warehouse[,] or offices (except for office or warehouse use incidental to a permitted retail use or for banks, finance companies and the like); or (iii) for a food supermarket selling food for off-premises consumption. The term "food supermarket" shall not, for the purposes of this Lease (but without limiting those other retail uses which would not be considered to fall within the term "food supermarket"), be deemed to include restaurants, whether "take-out" or otherwise, including by way of illustration and not limitation, pizza shops, steak shops, sandwich shops, Chinese restaurants, hamburger restaurants (such as, by way of illustration and not limitation, McDonald's, Gino's and Burger King type restaurants), health food restaurants[,] and ice cream parlors.

*Id.* at 54-55 (emphasis added).

On December 9, 1992, Village "assigned its interest in the Lease to [] Price Chopper by means of an Assignment and Assumption of Lease and Subleases dated November 9, 1992 . . . for a fixed annual rent [of]

_____

[5] Tenants were permitted, under the Agreement, to extend the lease term for four consecutive five-year terms (Renewal Period), under the same terms and conditions of the original lease. *See* Indenture of Lease, 1/15/80, at 3.

$245,000[.]." **See** Third Amendment of Lease,[6] 12/15/92, at 1-2 (unpaginated); **see also** Appellant's Brief, at 7 ("Price Chopper assumed the obligations of the original tenant[, Village,] and the terms of the Lease through a[] 'Third Amendment of Lease' executed by Price Chopper in 1992[.]"). The terms and provisions of the Agreement were not otherwise modified and "the parties agree[d] that it shall continue in full force and effect . . . [and] if the terms of th[e] Third Amendment of Lease and the Lease shall conflict, this Amendment shall govern." **Id.** at 2 (unpaginated).

At the time of the Village-Price Chopper assignment, Shillington was a landlord and owner of the shopping center. In August 2002, Price Chopper ceased operating on the Premises and moved its business to a nearby shopping center located in Edwardsville, less than two miles from Kingston Plaza.[7] Although the Premises remained vacant, Price Chopper continued to pay rent to Shillington for the remainder of its lease term at Kingston Plaza.

On December 5, 2002, Shillington filed a complaint against Price Chopper alleging: breach of lease (Count I); breach of duty of good faith and

---

[6] Kingston and Village entered into a "First Amendment of Lease" on May 12 1980, and a "Second Amendment to Indenture of Lease" on December 1, 1980. Village assigned its interest in the lease to Price Chopper by an "Assignment and Assumption of Lease and Subleases" dated November 9, 1992. Price Chopper's rent was increased to $245,000.00 per year.

[7] In its cross-motion for summary judgment, Shillington alleges that Price Chopper "placed a large sign in its vacant window suggesting potential customers begin shopping at [its] new store, a few blocks away" from Kingston Plaza. Plaintiff's Brief in Support of Motion for Summary Judgment, 7/9/24, at 2.

fair dealing (Count II); and intentional interference with prospective contractual relations (Count III). Shillington alleged that "[a]t no point in the Lease Agreement, any subsequent agreement, or any amendments, did Shillington [] or Price Chopper agree that Price Chopper was permitted to close its store, cease operations, or go dark." Plaintiff's Complaint, 12/5/02, at 4. Moreover, Shillington alleged that, due to the terms of the Agreement, Price Chopper breached the lease where it ceased operating "as a traditional anchor tenant supermarket in the [] Premises," *id.* at 4, and "ha[d] not assigned or sublet the property to a[nother] anchor tenant/supermarket chain, nor continued to operate a supermarket in the [] Premises." *Id.* As a result, Shillington claimed that Price Chopper's actions "diminished the present worth of the property," entitling Shillington to "damages for lost rent from neighboring tenants whose rent is based on a percentage of gross sales." *Id.* at 6. In addition to seeking compensatory damages, Shillington also sought punitive damages for Price Chopper's "willful and wanton interference with Shillington's [prospective] and advantageous contractual relations with an anchor tenant supermarket." *Id.* at 10.

Price Chopper filed preliminary objections to Shillington's complaint claiming that the Agreement only obligated Price Chopper to operate a food supermarket during the "[c]ontinuous [o]perations [p]eriod (i.e., from December 2, 1981 through December 2, 1991)" and that following that period, it "was under no obligation to operate a supermarket at the Premises." Defendant's Preliminary Objections, 1/15/03, at 4, 5. On May 6, 2003,

following oral argument, the trial court overruled Price Chopper's preliminary objections. Subsequently, Price Chopper filed an answer and new matter; Shillington filed an answer to the new matter. On July 28, 2003, Shillington filed a motion for summary judgment. On August 22, 2003, Price Chopper filed an answer to Shillington's summary judgment motion and its own cross-motion for summary judgment claiming that it "is not in violation of the Lease Agreement." **See** Cross-Motion for Summary Judgment, 8/22/03, at 12. On December 12, 2003, the court denied the motion and cross-motion for summary judgment.

After Shillington filed a response to Price Chopper's cross-motion for summary judgment, the court ordered Price Chopper provide full and complete answers to Shillington's interrogatories and request for production of documents. **See** Order, 12/7/04.[8] In March 2019, at Shillington's request, the court conducted a status conference.[9] On January 7, 2020, Price Chopper filed a motion for judgment of *non pros* due to Shillington not prosecuting the case for over twelve years. Shillington filed a response and brief in opposition

---

[8] As the court notes in its Pa.R.A.P. 1925(a) opinion, the docket reflects no activity in the matter between December 7, 2004 and February 4, 2019. **See** Trial Court Opinion, 1/9/25, at 2 (unpaginated). **See also** Defendant's Motion for Judgment of *Non Pros*, 1/7/20, at 3 ("[T]here was no activity reflected on the docket for approximately fourteen (14) years and two (2) months.").

[9] In February and July 2022, at the request of Price Chopper, the court extended the discovery deadlines to March 2023.

to Price Chopper's motion.[10]  Following argument, on April 22, 2021, the court denied the motion for *non pros*.   Price Chopper filed a motion for reconsideration of the court's order denying its *non pros* motion; Shillington filed a motion to dismiss Price Chopper's reconsideration motion.  On February 1, 2022, the trial court denied Price Chopper's reconsideration motion and Shillington's motion to dismiss.

On August 30, 2023, Price Chopper filed a second summary judgment motion claiming there were no genuine issues of material fact in the record and that Price Chopper was entitled to judgment as a matter of law. Shillington filed an answer to the motion.  On November 2, 2023, the court held oral argument on Price Chopper's summary judgment motion.   On July 9, 2024, Shillington filed a cross-motion for summary judgment.   Price Chopper filed a response to the cross-motion.  On September 23, 2024, the trial court entered an order granting Price Chopper's summary judgment motion and denying Shillington's cross-motion.

Shillington filed a timely notice of appeal and court-ordered Rule 1925(b) concise statement of errors complained of on appeal.   Shillington raises the following issues for our review:

(1)    Should the trial court's grant of the motion for summary judgment in favor of Price Chopper be reversed since there are material facts of record in dispute that were not

_____

[10] On June 2, 2020, the Honorable Gartley Polachek recused himself from this matter "due to a personal conflict."  On June 19, 2020, matter was reassigned to the Honorable Thomas F. Burke, Jr.

considered by the trial court, which affect all of the causes of action and serve as a basis for reversal?

(2)    Should the trial court's denial of Shillington's cross-motion for summary judgment be reversed since the trial court misinterpreted the "continuous operations period" in the lease[,] which is clearly defined, even under the trial court's own analysis?

(3)    Should the trial court's decision and order as to the intentional interference claim be reversed since the gist of the action doctrine does not apply in this instant case and since there is a broader social duty at issue in this case?

(4)    Should the trial court's decision and order as to the breach of good faith and fair dealing [be reversed] since there is precedent for allowing this as a separate cause of action and since a jury can potentially find bad faith by Price Chopper under the current facts of record?

(5)    Does the doctrine of the law of the case and the coordinate jurisdiction rule apply and mandate reversal of the trial court's decision since a court of coordinate jurisdiction has already ruled on the same issues raised by the Appellee in denying a prior motion for summary judgment?

Appellant's Brief, at 3-4.

"[S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." **Summers v. Certainteed Corp.**, 997 A.2d 1152, 1159 (Pa. 2010) (citation omitted). "An appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion." **Nicolaou v. Martin**, 195 A.3d 880, 892 (Pa. 2018). The determination of whether any questions of material fact remain is a question of law, for which "our standard of review is de novo." **Summers**, 997 A.2d at 1159 (citation omitted). Finally, a "trial

court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court . . . may only grant summary judgment where the right to such judgment is clear and free from all doubt." ***Id.*** (citations and internal quotation marks omitted).

Shillington insists that, as the anchor tenant of Kingston Plaza, Price Chopper was not permitted to cease operations and leave the Premises vacant. Shillington asserts that not only did it rely on the anchor store to draw business to the shopping center, but that the other Kingston Plaza tenants considered Price Chopper to be a "big draw to [the] property" driving foot traffic and consumers to spend money. Appellant's Brief, at 9. Shillington complains that by continuing to pay rent until the end of its lease term, Price Chopper prevented another competing supermarket from setting up shop as the anchor tenant. ***Id.*** at 10. Finally, Shillington contends that it incurred damages due to Price Chopper "unilaterally plac[ing] signs [in its windows] to lure [] customers to [its] new Edwardsville location and away from Kingston Plaza." ***Id.***

> [L]eases are in the nature of contracts and are, thus, controlled by principles of contract law, including the well[-]settled rules of interpretation and construction. As in the case of other written contracts, the purpose in interpreting a lease is to ascertain the intention of the parties, and such intention is to be gleaned from the language of the lease. Such intention is not to be determined merely by reference to a single word or phrase, but[,] rather[,] by giving every part of the document its fair and legitimate meaning.

***Fraport Pitt., Inc. v. Allegheny Cnty. Airport Auth.***, 296 A.3d 9, 15 (Pa. Super. 2023) (citations omitted). "When the words of a contract are clear and

unambiguous, the meaning of the contract is ascertained from the contents alone." ***Kmart of Pennsylvania, L.P. v. MD Mall Associates, LLC***, 959 A.2d 939, 944 (Pa. Super. 2008) (citation omitted). Finally,

> [w]hether a judge has correctly interpreted a writing and properly determined the legal duties which arise therefrom is a question of law for the appellate court. The legal effect or enforceability of a contract provision presents a question of law accorded full appellate review and is not limited to an abuse of discretion standard[.]

***Dominic's Inc. v. Tony's Famous Tomato Pie Bar & Rest., Inc.***, 214 A.3d 259, 268 (Pa. Super. 2019) (citation omitted).

Citing ***Slater v. Pearle Vision***, 546 A.2d 676 (Pa. Super. 1988),[11] Shillington claims the trial court erred in granting summary judgment where the case "support[s] a reversal of the [t]rial [c]ourt's decision . . . since allowing Price Chopper to take the actions it did would inherently frustrate the purpose of having an anchor tenant in any shopping center." Appellant's Brief at 36.

In ***Slater***, the plaintiff-lessor of a strip mall sought an injunction to require one of its tenants to occupy the premises under the terms of the parties' commercial lease. ***Id.*** at 677. Although the tenant had paid rent under the lease, it had never occupied the leased premises. ***Id.*** Our Court focused its analysis upon whether the lessor stated a claim for relief based upon an implied obligation to occupy and use the premises. ***Id.*** at 679. ***See***

---

[11] Shillington also relies upon ***PVC Realty v. Weis Markets***, 56 Pa. D&C 4th 304 (2000), to support its position on appeal. However, as the parties note, this case is non-binding on an intermediate appellate court.

*id.* ("[T]he specific situation presented here [concerns] a completely vacant store front in an interdependent shopping mall where the lease itself contains provisions other than the use clause form which an obligation to use and occupy might be implied."). Applying the doctrine of necessary implication, the Court stated:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that[,] according to reason and justice[,] they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Id.* (citations omitted). The obligation, however, must have been clearly contemplated by the parties at the time of contracting or must be necessary to carry out their intentions. *Id.* (citation omitted). This obligation can be found to exist even when the language of a contract is unambiguous. *Id.*

In **Slater**, our Court reversed the trial court's grant of preliminary objections in favor of the tenant, concluding that the tenant had an implied obligation not to leave the premises unoccupied where "ample evidence" in the lease contemplated that the parties intended the tenant was obligated to occupy and use the premises. *See id.* at 679-80. The Court found that this "ample evidence" consisted of: (1) a sub-paragraph of the lease that provided "the tenant agrees to 'open the Premises for business to the public not later than ninety (90) days after Landlord's approval of [t]enant's plans and specifications[;]'" (2) an "abandonment" clause, written in different typeface than the rest of the lease, stating tenant may not allow premises to be vacant

- 12 -

for more than 60 days, with notice to Landlord, where vacancy is "necessary due to repairs or remodeling of [] premises or transfer of possession to a franchisee or assignee pursuant to the terms of th[e] lease;" and (3) a lease provision that created an "affirmative obligation" of tenant to keep the premises in a manner consistent with the general character of the shopping mall and to refrain from any "action or practice that 'may damage, mar[,] or deface the [p]remises or any other part of the [s]hopping [c]enter." *Id.* at 680. Based upon this evidence the Court found, as a matter of law, that the tenant had an implied-in-fact obligation to occupy and use the premises. *Id.*

In reaching its conclusion that preliminary objections were improperly granted, our Court stated:

> [I]n construing the lease to ascertain what obligations respecting use and occupancy it imposes on [tenant,] and thus in ascertaining the intentions of the parties to the lease, we must construe the lease as a whole in light of the circumstances surrounding its execution. Having done so, we are convinced that [s]hopping [c]enter has pleaded a minimally sufficient claim for relief perhaps capable of further support through an amended pleading, based on an implied obligation to occupy and use. In the instant case, **the lease is not completely silent on the tenant's duty to occupy. If it were, we would conclude that the tenant had no duty to occupy because the landlord failed to include such a condition in the lease. Here, several provisions on the lease can arguably lead to the conclusion that the parties intended that [tenant] would occupy the premises**.

*Id.* at 681 (emphasis added).

In ***Dickey v. Philadelphia Minit-Man Corp.***, 105 A.2d 580 (Pa. 1954), the plaintiff-lessor leased a vacant piece of land to defendant-lessee. The

parties' lease provided that the leased premises were to be occupied by the lessee "in the business of washing and cleaning automobiles within the scope of the [lessee's] business . . . and for no other purpose." *Id.* Five years after entering into the agreement, lessee ceased washing and cleaning cars, "except as incidental to simonizing and polishing." *Id.* at 581. Lessee continued to pay rent; one year later, lessor filed an ejectment action against lessee seeking possession of the premises "on the ground that defendant had defaulted by discontinuing the business specified in the lease." *Id.*

The Court framed the central issue in the matter as whether the lessee had an implied obligation to "continue to conduct the business on the premises of washing and cleaning cars if its failure to do so resulted in a diminution of rental payable to the lessor," where the rent payment was dependent upon the lessee's gross sales. *Id.* Notably, the Supreme Court recognized that when a lease requires a premises be used "only for a certain prescribed purpose," there is no concomitant obligation on the lessee "to use or continue to use the premises for that purpose." *Id.* Rather, a "use" provision in a lease equates to a "covenant against a noncompliance use, **not a covenant to use**." *Id.* (emphasis added). In affirming the judgment entered in favor of the defendant-lessee, the Court concluded that where the lessee's actions to generally discontinue the washing and cleaning of cars were taken in good

faith[12] and in the exercise of legitimate business judgment, it would not imply an obligation to continue the car washing business even if the result was to lower the rents payable to the lessor.

Instantly, Shillington asserts that Price Chopper was never permitted "to keep the anchor space empty, pay rent[,] and then walk away." Appellant's Brief, at 16. However, based upon *Dickey*, any provision in the parties' Agreement requiring Price Chopper to use the premises only as a supermarket does not mean that it was obligated to use or continue to use the premises. Rather, as the clear language of the lease stated, Price Chopper was required only to use the Premises as a supermarket during the proscribed 10-year continuous operations period. In fact, the parties specifically negotiated that Price Chopper continuously use the Premises during that period. *See* Deposition of Marvin L. Slomowitz, 12/14/04, at 7-10 (Kingston Plaza builder stating, despite fact lessor wanted tenant to operate as supermarket for entire 25-year lease term, parties negotiated that, after 10-year continuous operations period, tenant would not be required to continue to operate as supermarket on Premises).

_____

[12] In coming to its holding in favor of the tenant in *Dickey*, the Supreme Court noted that the tenant acted in good faith by not moving its business to another location or by deliberately seeking to decrease the percentage of its rent in order to force the lessor to terminate the lease. *See id.*, 105 A.2d at 583. Here, Price Chopper's rent was based on a fixed amount, not a percentage of the supermarket's gross sales. Notably, Shillington alleges in its complaint that Price Chopper's **neighboring tenants'** (not Price Chopper) rent was based on a percentage of gross sales. *See* Plaintiff's Complaint, 12/5/02, at ¶ 28.

Moreover, unlike **Slater**, the Agreement between Shillington and Price Chopper did not contain an abandonment clause.  However, the Agreement did include a restrictive covenant preventing Shillington from leasing space to another supermarket in the shopping center *while Price Chopper continued to operate as a supermarket or conduct business in the shopping center*.  **See** Indenture of Lease, 1/15/80, at 54-55 ("During the term of this Lease, unless Tenant has theretofore discontinued conducting business at the Demised Premises or has ceased to operate the Demised Premises as a food supermarket, Landlord agrees not to use, let or sublet or to permit the use, letting or subletting of any other store, in the Shopping Center . . . for a food supermarket selling food for off-premises consumption").  **Cf. P.V.C. Realty v. Weis Mkts., Inc.**, 56 Pa. D.&C.4th 304, 313 (2000) (non-binding case holding "extensive evidence" in lease showed parties contemplated and intended "so long as [tenant] operated a business in [the leased premises,] it would operate [only] a supermarket").  Thus, the parties' Agreement *did* contemplate that Price Chopper might discontinue operating or stop conducting business in the shopping center during its lease term.  **See Pocono Summit Realty, LLC v. Ahmad Amer, LLC**, 52 A.3d 261, 269 (Pa. Super 2012) ("When the restrictive covenant is unambiguous, the Court's review is limited to the confines of the covenant.").

Here, the plain language of the Agreement obligated Price Chopper to lease the Premises from Shillington for a 25-year term after the RCD.  Under the Agreement, Price Chopper was required to use the Premises as a

supermarket for ten years from date of the RCD, or until December 2, 1991. The lease specifically provides for the possibility that the anchor tenant may discontinue conducting business at the Premises or cease to operate the Premises as a food supermarket. Accordingly, under the law, this is not a situation where a court would apply the doctrine of "necessary implication" to require Price Chopper to use the premises past the 10-year Continuous Operations Period. *See Kaplan v. Cablevision of Pa., Inc.*, 671 A.2d 716, 720 (Pa. Super. 1996) (doctrine applies only in "limited circumstances . . . when it is necessary to prevent an injustice and it is abundantly clear that the parties intended to be bound by such term").

Furthermore, there is nothing in the Agreement preventing Price Chopper from opening another location outside the shopping center or from placing a sign in its window informing customers that the supermarket had closed and that they could visit the new Edwardsville store. In fact, the parties included a "Signs" clause in the Agreement stating tenant must comply with "any applicable requirements of governmental authorities . . . and shall obtain any necessary permits[.]" *See* Indenture of Lease, 1/15/80, at 28. Had the parties intended to otherwise limit the use of signage by Price Chopper or prevent the supermarket from opening another store nearby, they could have included such provisions in the parties' amendment to the Agreement. *See Glassmere Fuel Serv. v. Clear*, 900 A.2d 398, 403 (Pa. Super. 2006) ("A court should only imply a term into a contract where it is clear that the parties

contemplated it or that it is necessary to imply it to carry out the parties' intentions.") (citation omitted).

Thus, looking at the Agreement as a whole, which we must, we agree with the trial court that there is no genuine issue regarding whether Price Chopper breached its lease with Shillington. Moreover, because there is no independent cause of action for breach of the duty of good faith and fair dealing, the court also properly granted summary judgment on this count. *See McCabe v. Marywood Univ.*, 166 A.3d 1257, 1261 n.2 (Pa. Super. 2017) (Pennsylvania does not recognize independent cause of action for breach of covenant of good faith and fair dealing). Finally, Shillington's claim that Price Chopper intentionally interfered with prospective contractual relations is barred by the gist of the action doctrine where the basis of that claim is firmly rooted in the parties' Agreement and it does not encompass a violation of a broader societal duty.[13] *See Reardon v. Allegheny College*,

---

[13] Shillington claims that the gist of the action doctrine does not apply to the instant matter because "there is no question that the Lease did not allow, or even contemplate, the intentional act of Price Chopper in encouraging potential patrons to go somewhere other than the Kingston Plaza." Appellants' Brief, at 38-39. However, we have already determined that there is nothing in the Agreement preventing Price Chopper from opening another location outside the shopping center or from placing a sign in its window informing customers that the supermarket had closed and that they could visit the new Edwardsville store. *See supra* at 17. *See also Pittsburgh Construction Co. v. Griffith*, 834 A.2d 572, 582 (Pa. Super. 2003) ("Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.").

926 A.2d 477, 486 (Pa. Super. 2007) (gist of action doctrine forecloses tort claims arising solely from contractual relationship between parties, alleged duties breached grounded in contract itself, liability stems from contract, and success of tort claim dependent on success of breach of contract claim).  Thus, summary judgment was properly granted where the record contains no genuine issue of material fact and Price Chopper is entitled to judgment as a matter of law.[14]  ***Summers***, ***supra***.

_____

[14] To the extent Shillington claims that the trial court was prohibited from granting summary judgment in favor of Price Chopper on the basis of the coordinate jurisdiction rule, we find no merit to this claim.  Under the coordinate jurisdiction rule,

> [] judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions.  [***See***] ***Commonwealth v. Starr***, [] 664 A.2d 1326, 1331 ([(Pa.)] 1995).  The coordinate jurisdiction rule is premised on the sound jurisprudential policy of fostering finality in pre-trial proceedings, thereby promoting judicial economy and efficiency.  ***Id.***  This rule applies equally to civil and criminal cases and it falls within the "law of the case" doctrine.

***Riccio v. American Republic Ins. Co.***, 705 A.2d 422, 425 (Pa. 1997). Generally, "a later motion should not be entertained or granted when a motion of the same kind has previously been denied."  ***Id.*** (citation omitted). However, when there has been intervening changes in the facts or the law clearly warranting a new look at the question, a judge may grant relief on the subsequent motion.  ***Id.***

Here, Price Chopper moved for summary judgment twice—once on August 22, 2003, and, again, more than twenty years later, on August 30, 2023.  In its first motion, Price Chopper argued that it did not breach the Agreement (Count I) where "the clear and unambiguous language" of Paragraph 8(B) of the lease did not obligate Price Chopper "to operate a food supermarket at the [p]remises following the expiration of the Continuous Operations Period." Defendant's Cross Motion for Summary Judgment, 8/22/03, at 7.  Price
*(Footnote Continued Next Page)*

- 19 -

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 09/04/2025

---

Chopper's second motion argued that nowhere in the Agreement was it obligated, either explicitly or implicitly, to assign, sublet, or otherwise [have] another supermarket" operate in the Premises upon its vacation. ***See*** Defendant's Motion for Summary Judgment, 8/30/23, at 6-7 (discussing Counts I and II of Complaint). Moreover, Price Chopper also argued that the intentional interference claim, Count III, had to be dismissed under the gist of the action doctrine, ***id.*** at 8, and that Shillington failed to support a claim for punitive damages. ***Id.*** at 17.

Although Price Chopper's first motion was denied by one trial judge and then, over twenty years later, the second motion was granted by a different trial judge, we do not find that the coordinate jurisdiction rule was violated where: (1) Price Chopper's two motions varied substantially in content and legal argument and (2) additional facts and evidence (including discovery and depositions) in the matter were known to the second judge when ruling upon the subsequent motion. ***Riccio***, ***supra***. ***See also Starr***, 664 A.2d at 1332 (exception to coordinate jurisdiction rule applies "where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed"). We also find it disingenuous that Shillington also filed a second summary judgment motion, yet argues that the court could not rule in Price Chopper's favor on its second summary judgment motion.